Page number 23-5175, Delaware Valley Regional Center, LLC, et al, at balance, versus United States Department of Homeland Security, et al. Ms. Hartnett for the balance, Mr. Goldsmith for the appellate. Ms. Hartnett, good morning. You may proceed when you're ready. Morning. If that's too high for you, there is a button where you can lower it a little bit. And it also, the more your voice hits the microphone, the better it is for the recording. I will do my best. Good morning, Your Honors, and may it please the Court. Kathleen Hartnett on behalf of appellants. I reserve two minutes for rebuttal. Your Honors, despite the complexity of the immigration system generally, and the EB-5 process in particular, this case is straightforward, both on final agency action and on the merits. The USCIS policy at issue in this case is conclusive, unqualified, and presently having serious legal consequences, including for appellants here. They cannot seek or obtain an infrastructure project determination regarding their investment project because of the policy. Can I ask you a question about that? Yes. As I was reading through these papers, the question in my mind was, why can't your clients reapply for these reserved slots based on the infrastructure project that they invested in? Thank you, Your Honor, because USCIS has made clear that their business plan for their project has already been adjudicated. And what USCIS has made clear first in the statements of policy at issue here, but then confirmed by its position in this case, is that it believes that only infrastructure projects that are initiated, applied for after the enactment of the RIA, would be subject to such a determination. I was confused by that, just because what you're challenging is actually, you're reading a lot into this, what they said, you know, on their website and then in their manual, because all they said was, we'll adjudicate this when you apply. And to me, that doesn't mean that you can't reapply, not based on the words that you're challenging. And it just seems to me that it would be a lot clearer if you applied and they rejected it, and then we have a record to see why they did so, et cetera. But what's very odd to me about this case is that you are challenging something very basic, you know, we'll adjudicate this when you apply and reading into it. I understand your question. I do think this is, and the court's familiar with some of USCIS's way of making policy and rules, including the Costa case, where the Q&A documents frequently were important. It's not about, you know, where they did it, but the actual policy doesn't seem to necessarily apply what you think the consequences are. Your Honor, I understand that, yeah, I didn't mean to say that. What I meant to say was that often USCIS can speak in a little bit more, less clear or more oblique terms than desired. What the statement here means is that they will adjudicate this at the time of the application, and because our application has already been adjudicated, they will not adjudicate ours. And I would, you should confirm that with the government, but that is our understanding, and thus submitting a 956-F would be futile. One follow-up on that is, can we just take their position in a brief to be their position too? It's just, it's not sort of the administrative record. That's what I'm having trouble with. Well, they understood our complaint in this case to be what it is, that the policy, even though the words could have been more clear, is tantamount to saying you must have your project initiated after the RIA to be able to have an infrastructure project determination. And so, I agree with, I appreciate your point, but the language is an oblique way of saying that. That is what the policy means. That's what the regulated community understands. And filling out and submitting a 956-F, which I would also point out, they have not created a form to allow us to do this because they actually don't think we are able to do it. So, I think there may be some confusion because you represent clients who are both the individual investors and also the project. Is that right? Yes, Your Honor. The application that, at the time of adjudication of which this determination is made, is the application by the regional center project, right? The infrastructure project, not the application by the investor. Yes, Your Honor, mostly. So, pre-RIA, there were two ways that you could try to get your business plan approved. You could attach it as, if you're an individual investor, you would attach the plan to your individual petition. Then, in 2013, because that was cumbersome, you had all these people attaching plans to different petitions, USCIS issued a policy memorandum saying you can use, the regional center can do this at the exemplar level. So, that's that term you see. An exemplar was essentially the post-RIA business plan. That allowed USCIS to make a determination based on the regional center level, and then all of the individual investors could point back to that plan. So, the premise of, I took the premise, and she can speak to this herself, but I took the premise of Judge Pan's question to be that an investor could say, I want to be investing now in an infrastructure plan. And there wouldn't be a new determination as of that investor's application for the reserve visas. It would have to be that Delaware Valley is applying to say, we want to be a post-act qualifying infrastructure center plan. That's how we would believe it would work, especially post-RIA, where the regional centers now must be the ones that file those. The new regime does not allow for the investors to do that as attachments. And can a regional center that was approved pre-act sort of step up its status under the act? Do you understand that to be clear or not clear? Sorry, did you say a regional center or a project? A project, I'm sorry. So, we now know after the whole Bering litigation that a regional center at that level can step up. There is no place within the act, there's no provision for that as we see it, and nor has there been any process created by the USCIS to allow that. So, essentially, the projects that have been approved before the act sort of stuck in the status of having been approved before the act. And again, we're doing our best here to understand what the regulators are telling us. From our perspective, we should be allowed to have the infrastructure project determination. There is no form for either an individual investor or for the regional center to actually obtain this additional finding. And I think we do now know for sure that there was ambiguity about it prior to litigation that the USCIS would deny that because they believe that the RA only allows for infrastructure project determinations for projects after the act. And the district court and the USCIS both say there's no final agency action here because the relevant legally binding effect is just directly from the statute. That the answer and the policy that you're challenging is simply a restatement of the statute. Yes, that's their position. It was not that we had another avenue, which again, I believe would be futile. But, you know, we, but yes, their view was, because we're simply just challenging what Congress has told USCIS to do, that that's not a final agency action. And how can we tell whether your position, which is that the agency has added something significant, how can we tell whether that's the case? I mean, the district court didn't even seem to perceive any of that. Anything about the statement on the, on the website and in the policy to be, to be in any, there's no daylight between that and the statute and how are we supposed to determine which it is? Well, I mean, Your Honor, we respectfully submit that by law. So the district court sort of, I just didn't read that. It did not totally map the Q and A and the policy manual onto the statute itself. It is true that the second paragraph in the Q and A, which we did not highlight because it was simply the restatement of the statute, did not create a new policy. It replicated the definition of infrastructure project. If that is all that the USCIS had done, we probably wouldn't be here. But what they also did was they said that we will make adjudications about infrastructure projects at the time of adjudication of the application for the project. And so that was the, albeit, I agree, Judge Pann, a little bit cryptic sentence that they first put in the Q and A under a statement called policy. They then added to the policy manual. And it was that additional sentence that actually created, which has been a very consequential and important policy, meaning that zero infrastructure project visas have since issued since March of 2022. And just to be clear, the language that you're referring to is filed or approved. So, the language that created the final agency action is the point of that would be adjudicated at the time of, so the policy that we're challenging is the policy whereby DHS will only adjudicate, make a determination about an infrastructure project at the time it adjudicates whether the business plan may go forward. So, it's this, excuse me, it's this sentence USCIS will determine if the investment is in a qualified infrastructure project when adjudicating the regional centers project application. That's the language that you object to, right? Correct, your honor. And if we think that the statute requires that, I know you would disagree, but if we think that the statute requires that, then it would seem to me that you not only lose the merits, right? Losing the merits of the statute, if you're objecting to a sentence that the statute requires, you would lose on the merits. Correct? Yes. Okay. And then you would also probably lose on final agency action because it's not final agency action for an agency to accurately summarize a statute. I disagree there, your honor, just because it is not simply replicating what the statute, it's not the words of the statute. I think if the agency made a choice about something that the statute does not expressly speak to, which is the time at which the infrastructure project adjudication is made. I baked that into my hypothetical. No, I understand, but I do think there's a real risk. I think the statute requires the sentence that you object to. I'm not saying it requires that it be on the website, but I'm saying if I think that the statute requires USCIS to do what this sentence says USCIS will do, then it's not final agency action for USCIS to make a statement that says we will do what the statute requires us to do and it requires us to do this thing. I actually, I do disagree with that. Just an example, even a final rule, oftentimes an agency believes that the action it's taking is compelled by law. That will be their position in the litigation. They'll put it into the whole preamble of the notice in the federal register. They'll argue in their briefs. And so I think the Gomez decision, I appreciate it's a district court decision, but we cited it in our briefs talks about in a way where the agency has decided to take an action here, not to accept a form to make a process unavailable to us based on its view that that actually is what the law requires. That's almost more of a clearly final agency action, because if you look at the two prongs of the inquiry, you have a conclusive position and you have a legal consequence. And so I actually do believe that those are two separate inquiries and here we're collapsed into one. It's a separate question of whether there was enough formality here. Did it meet the requirements of final agency action? So I would say that all the time, agencies believe that their positions are compelled by law, but yet that doesn't prevent someone from challenging it as long as it hits the two prongs. Yes, I can. The final agency action inquiry, I think, is not jurisdictional. Do you agree with that? That's under this court's view. Yeah. And it's a pragmatic one. And so, I mean, here, this is just the practical consequence, which I think the court's opinion in DaCosta and many other cases in which you're encountering a complicated process is to look at what does this agency do in practice. And here we have an agency that frequently makes important statements on its website. This is a consequential one. As I pointed out, so far, 400 reserve visas have gone unused because they do not apply at Congress, did not expect that 200 more will be. So it seems to me that what you are challenging, which is just we're going to evaluate whether you qualify for these new set-aside visas when you apply for them, the time that we adjudicate your application. That seems to be the default way statutes work. Like, this is a statute that says, here's a new benefit. We're going to reserve 2% of the EB-5 visas for infrastructure projects. And to get that benefit, you have to show, you know, your business plan was approved and you have to, you know, invest $800,000. And it seems like you have to apply in order to show that you qualify. That's implicit in the statute. It's the way, that's the default way statutes work. They say, if you want this benefit, you need to meet these qualifications. You have to somehow show that you meet these qualifications. So it just seems to me that what the agency put on the website is the default rule, the implicit way that should work. And in my view, it shouldn't preclude someone like your clients from applying because I know that there's a lot of dispute about infrastructure projects, but you also have to show you've invested $800,000. So that would require your clients to apply again in order to get these particular set-aside visas. I know that they've already been qualified for the non-reserved visas, but to get these, it seems like you would have to apply anyway. And I don't see why this language is wrong. Okay, this is more moving just to the Contrary to Law piece. There's just a really important point there, which is that the petitions have been granted, as you noted. So our individual investor clients had invested the amount that was required at the time, several years ago. That's now been inflation adjusted in the new statute. But they got, we're not, nothing's taken away from them because they're still in line for unreserved visas. This is a question about what did Congress intend for the new benefit to go to? Correct. And so your clients, they did what they were supposed to do. They qualified in the pre-RIA program and they got what they asked for, which was a place in line in the unreserved visa pool. And now there's a new benefit, which it's not clear that they qualify for. So why shouldn't they have to apply to get this new benefit? Well, to begin with, the government hasn't interpreted the statute to allow that possibility. I guess that would have been a different case if they had. I understand that, but I just don't see the interpretation in this text of what we're talking about here. And I don't know that we can just rely on what they say in their brief. It seems to me you would need to apply, they would need to reject it, there would need to be a record as to why, and then we can evaluate the position. But I just feel like we're, this whole case is based on stuff that's not in a record. Well, to begin with, I believe they had taken a position there is not an administrative record available for this case. But if you applied and they rejected it, then there would be. Maybe there'd be a different one, but I really respect this. This is an immediate, I really want to answer your question, because I think the point is that, and this is a different, this is 1154, it's in our addendum, people that already had petitions granted are, it's like being at the DMV, you're in the waiting room, you've gotten through most of the lines, and now you're going to actually wait to get the visa. And there's one line that has the A numbers, and there's another line with the B numbers, and another line with the C numbers. Nothing has been prejudged about our clients as to which visa they're going to get. They're just waiting to get what is available to them. That's the State Department. But the problem here. It's an EB-5 visa pool, though. Correct. So they're sitting there in the waiting room with everyone else. They did not apply to and buy into an unreserved line. They pop in and. It's an unreserved, I'm sorry, but the unreserved line was all that there was when they applied, so they got exactly what they applied for. This is a wrinkle that's not fully fleshed out. They actually were in an employment area, TEA, which is another category that's no longer the subject of reserved visas. But the reason why they have $500,000, rather than the higher investment amount, is because they already had been actually investing in both an infrastructure and a high unemployment area project. I'm sorry, so did they have a reserved line that had been taken away from them by the RIA? Not by the RIA. Possibly, yes, but that's not the problem because that wasn't going to get them the visas as quickly as this would. I know. Let me ask you a question that might help me. So it seems to me that when you're talking about your investor clients, the point of this program from the perspective of the United States is to use the value of a visa and permanent residency to incentivize investments in the United States. And so your position, it seems to me, decouples the qualifying for the investment and the eligibility for the visa and permanent residence and saying we've qualified to get a visa, whatever visas are available, we should equally be qualified for. And I think that there's a very basic congressional purpose that might be contrary to that, which is you've already invested. This is related to what Judge Pamela said. You've already invested and you've gotten the offering that was then on offer, which wasn't as rich as the offering now, which is to get a priority date. And unfortunately, if you're from an oversubscribed country, that means you have a long wait. But racket that for a minute. There's a separate issue with respect to – so arguably on the merits, it doesn't make sense to read the statute that somebody who's cleared step one, that Congress necessarily meant to give them eligibility for a reserve visa because they've already invested. But for your client that is a project, if they still need investment, why shouldn't they be able to step up and qualify as not just a project, but a project that is associated with eligibility for set-aside visas? And is that in this case? Thank you for the question. First of all, the project in this case is actually completed. The infrastructure – Completed. Yes. So all of the investors that are waiting for their visas have had to redeploy their capital to other situations, other investments to keep it at risk to get their visa. And on the 500 to 800, I respectfully submit, I think that the district board just didn't – I hear that that could be a policy interest, that we are going to only incentivize people going forward, and thus you have to pay more, but you're going to get a better benefit. I respectfully submit that's not what the statute does, and is not in the legislative history. That's an argument about what it could do. There's an equally strong argument that we think is correct, that this is – it just starts – the statute starts with that we're all in, you know, E-5. First, they say there's going to be this many E-5 visas a year. Second, they're going to go be dispersed in this percentage. Those are current active requirements. Go spread them this way. And given the backlog that exists, if they were to read this to apply to already approved infrastructure projects as they should, there would be 400 additional visas that would have been out the door right away last year. So there is a policy interest in unclogging, in rewarding the high value projects here. This was an actual real public infrastructure project that helped the people in the Philadelphia area, 6,000 jobs. And the idea that Congress would have created a category of infrastructure project visas to have them go to waste. Well, they're not going to waste. I mean, it looks like it's slow getting going, but those ones that are unused, they roll over to the next year, right? For one year, then they go to the reserve pool. Then they go back to the reserve pool. And reserve pool. So the people who are sitting on their priority date and waiting, those will flow to them in keeping with the percentage, the country caps. I mean, the real bugaboo from your client's perspective is the country caps, right? Yeah, I just, I do still think that somehow for some reason, and I understand there's an instinct here to think about what could the reason be or whatever, you know, kind of what's motivating it here, but we don't have any reliable indicia of that. We do have a statutory language. And I just think that's part of the challenge that we're facing here is to just kind of start from the premise of normal statutory interpretation. And it says that reserved MISAs shall be available now. Today, that's what that provision is not about time limited. It's only for five years, so there are times of wasting. And then we have another category that says infrastructure projects are filed or approved plans. What does approved mean there? So I'm just really taking us a little bit to our original argument, but I do think it's valid to start with the statute. Congress should draft a better statute if it doesn't want it to be. I'm sympathetic to your reading of approved, but it just seems to me that that's not all there is to it. It's an infrastructure project, and you have to invest $800,000, and it has to be certain types of projects. It seems like you're saying that based on what you've already done, the agency should have to go back and comb through the things that they've done before and see what might fit. But I don't think any of them will fit because none of them invested $800,000. You should have to reapply. I think that could have been a good regime to prepare, and that maybe made sense. I mean, the regional centers reapply, but they don't have to provide any additional investment. I think there might be a different story if the agency had said, look, we appreciate that there was an infrastructure project approved before. Can you please make sure you have all the – I mean, essentially, it's the same paperwork that was submitted before, but the investment amount is a different question. It's inflation adjusted, too, so it's not like there's the $800,000, and I think it's really helpful to look at that full provision. It's in the addendum. It's not just tying the $800,000. If you invest $800,000, then you get a reserve visa. What it's saying is that that is an inflation-adjusted amount, and there's now a mechanism in the statute to continue to have it go up. This had been $500,000 since, I think, the 1990s, and so there would have been a DHS rulemaking to try to move it up for inflation. It got struck down due to an appointments clause issue. So I think just really try to understand what is Congress trying to do here. I think we actually feel good about the policy argument that they realize there's a lot of people waiting for visas. There's infrastructure projects that have been filed or approved, and we fit that bill. Right now, those visas are going to waste, and so it doesn't, in our view, incentivize anyone for foreign investment. They're not ever going to waste, right, because there are plenty of people in line that want them. They're going to waste toward the point that Congress is trying to make a point, which is this program has been rife with fraud. We have some parts of the program that are really important, and those are things where there's an infrastructure project, where there's a real high unemployment area or a rural area that's being served. Those are supposed to be the ones that are the marquees. We have the marquee project, in our view, the only known infrastructure project, which is our clients who built this $6,000. And so we try to understand what was Congress doing, rewarding a regional center that was doing the right thing, rewarding the people that invested in that, and it's not a windfall for them to simply get priority in the visa line. Just like, and I think an example, an analogy might be helpful, like in the I-130 process, say you're a permanent resident, you're sponsoring family members, you get upgraded to a citizen, then your family members go to the front of the line. It's just not that unusual for someone who already applied at a time, hoping for the best, sitting there in the DMV lounge, that suddenly there's a new process, a new line opens, the express line opens at the supermarket. Congress, the question is not— You wouldn't object to having to reapply based on your prior infrastructure? If they were to process it, I mean, everyone's nervous about any reapplication that requires— we might be hearing two years on unreasonable delay, but I think the thing our client would not have minded having to reapply to formalize their request for the infrastructure project determination— When you say our client, there you mean the project? Either, yes, it would be the project applying. I do think that the investment amounts should not go up because those are grandfathered in under 1154, and there's nothing in 1153 that conditions the reserved access for infrastructure projects to a higher investment amount. It would be actually—not to pull on the unfairness thing, but these people have made their investment several years ago, 2016, 2017, their capital has been at risk the whole time. In a way, it's—anyway, I think I would object to— The program demands a lot of people, especially from countries like India and China, who then wait, wait, wait, wait. They have to keep their capital tied up. The United States benefits from that investment. People from undersubscribed countries are getting the benefits. People from oversubscribed countries aren't. I guess when you talk about unfairness, isn't it also somewhat unfair if at the time of application, there are compatriots of your individual investor client who have, let's say, a higher priority date? They've been waiting longer. And if, because of the RIA, your clients get set-aside visas, they effectively jump ahead of their compatriots from an oversubscribed country who've been waiting longer. I think the immigration system is rife with, you know, occasional unfairnesses and just people, you know, what line you're in. I do think that the other thing here, though, would be that this would say that new infrastructure project investors who invested only the institution-adjusted amount would get to jump ahead of a line of people like our clients that have been waiting in the line for years now. Jump ahead only if they meet, as you were saying, the specific priority items, the, you know, areas of high unemployment, the rural areas. But just focusing on, like, the infrastructure project, the hypothetical one that doesn't appear to exist of the new infrastructure project that's not going to be incentivized because no one's going to want to do this if they can't see visas flowing. But, yeah, assuming that project, my point is that those new investors would then be able to just pay an inflation-adjusted amount, $800,000, to get an immediate reserve visa. Whereas my clients, including the individual investors, invested $500,000 years and years ago, and they would still be waiting. So I would say there'd be an actual unfairness there to allowing new infrastructure project investors access to that just because they pay down when we've been in the line for a lot longer and have an actual... But isn't this a new line? This is a different line from the one that you've been in. Oh, I'm just saying that we were just talking about the unfairness of possibly seeing the infrastructure people as jumping ahead of people with higher, like, longer days. I'm with you on this. Yeah, yeah, it's more... I'm saying, isn't it a different line? Because now the RIA has created a new category, and now we're going to start a new line for this new category. If you look at it that way... If you look at it that way, I'm just saying that to the extent that they would be required to pay more when they've already had their money at risk for years, it would be kind of unfair to have them have to now pay $300,000 extra to join that line when they've actually been... They've had their money in... This could be part of the application I think you should file, which is, like, we should be able to... That would be rejected. It would be rejected. It would be rejected.  There's no form to start. Even aside from that, if we... Here again, we're talking about the individual investor. Either one, I guess. I mean, there's a risk for the individual investor if they were to submit a revised application. There is. Yes, so that's why that's really... And it's also not at the investor level that the determination should be made. It's at the plan level. So if there were a form tomorrow that our client could just simply file, show that we had an infrastructure project, the USCIS already said it was one back in 2017, and we could get the determination because we filed a new form, that would be great. I thought you said there's a statute that said that it's inflation adjusted, so why isn't the amount they invested good enough? That's our view, but we were... I think that you have to actually interpret the statute to make sure you agree with that, but that's our view. So you're saying that that's your view, but you don't know if the agency would take that view and it would just slow you down even more? I think currently, I mean, they can speak for themselves. I think the current thing would be your plan was already approved before. There's not a process for you to do this. And I guess maybe even if you were able to do it, you'd have to put in more capital. That's speculation. So just to clarify, it's your position that the reserve visa provision should best be read just to instruct the agency how to allocate EB-5 visas to those applicants whose petitions have been approved, whether their applications, the individual investor applications, were filed before or after the act? Yes, and that's because a combination of the B-5B provision, which just says the visa's made available this year, and they're currently available. There's a bullet in the cut-off that says there's available for these 20%, 10%, 2%. That's the State Department, by the way. So the State Department's over there with their file of visas, and then you have USCIS over here not willing to make a determination here that would open that floodgate over at the State Department waiting room. And I gather that the high unemployment or rural area visas are on a different plane, or do you think the same should be true of those, that there are the reserve visas that should be available to people who invested and applied before the act and were cleared step one before the act? Are there people in line who should be pulled out and given the set-aside visas for those others? Is this statute parallel with respect to them? I think I want to be careful of not, with the caveat, we haven't briefed this, so it would be, but my understanding is that the high unemployment area requires a new calculation. There's actually like in the act some additional process that has to happen that could not have happened before the act. So we have filed or approved plans. The act otherwise refers to plans approved before. So we fit the high unemployment, the way that works, it seems like it needs to be a new calculus part of the problem. And so the implication of that is that there kind of isn't, at a kind of analytic level, the project in which they invested wasn't the qualifying thing when they invested. Is that what you're saying? I believe so. Where your clients was? Yes, and that's how they treated that category. And I think the important piece that I hope this comes through in our briefing is that the F part of the statute makes clear that, you know, plans approved before still count. And so in this case, the infrastructure project, you could meet those criteria without some new process. You just have to look and figure out, is it actually a real. It's not true of high unemployment. I think, but rural, I think is similar to us. Okay. That's my understanding, but I'm not. So on your theory, and I know that's not the case. I'm going to have to decide it, but just for understanding the nature of your, your argument. You would assume that if you prevailed that people who have a priority data and have long been working in the queue who had invested. Back when pre act in a project that meets today's rural areas. Definition should be pulled out of the queue and also given visas that are set aside under the act. I just, I'm. I'm not sure. I just, I mean, I'm going to decide that in terms of your understanding of how to theoretically. Yes. I mean, I guess the point. Yes. As a conceptual matter, B says these are the categories that are available effective immediately each year. So far, the state department has been allocating them to those categories and they haven't been used and they've been reverting to the regular pool. And we're coming up on your two. What do I make of the fact that post act there's a, An investment dollar difference between people who are applying that the. Investors who are seeking set aside visas and the investors who are simply seeking. A priority date. So that's always been a distinction between people that was the prior thing. It was the prior kind of targeted employment area. So that's why our clients had 500 to start was that we kind of fit that. Then now we fit the infrastructure project now. But yeah, so there's always been a distinction and the, I do think looking at the whole provision really makes clear. It's an inflation adjustment because it says C2 adjustment. We're targeted employment area infrastructure projects. It's not. And then it goes right on to. Three automatic adjustment and that's every five years. It's going to go up again for inflation. So I think if you look at C is clear what they're doing here, which they already tried to do in the struck down rule is to get something that's going to work going forward for making them amount work. It was not speaking to whether that was something that would have to be considered. There's no T a dollar amount anymore. It's just 800. Like instead of the 501 million plan, it is 800 per TDA, but now. That's the generic term for both rural and high unemployment. So now TDA has become these two separate categories. And so, yes. So for, for the, for the. Priority line. It's the, it's the lower amount for the regular line. It's the higher amount, just like it did not include infrastructure. Not before that's a new category in the statute. Which has been also the Congress has been trying to pass since 2016. There was a bill with this language in 2016, 2017. Back when the project was still happening. So. I guess, you know, at the end, I appreciate it. I far exceeded my time, but we're just trying our best here with the statute. Just figure out what Congress meant. You have a. Words that include us. You have no explanation on the other side. We don't know why they say founder approved. We have people ready for visas that fit the bill. And to the extent policy concerns are at issue. I think seeing a system that functions well where people are who put their. Capital at risk for valid investments, actually get visas and see progress. I'd respectfully submit that we'll do much more to advance the Congress. Purpose and. So just to pin it down, you're the individual investor clients. Applied. At a sort of bargain rate and a lower rate. For a TDA qualifying project. That's correct. Therefore their investment in your view. Is analogous to. Meets the, you know, checks the boxes of what a new investor would get for an 800,000 dollar investment. Yes, that's correct. If in fact, if it in the government, doesn't that. We were still on the right. We're okay to be in line for that. If we actually were in an unreserved category, we'd have to have bought in with even more money again. Yeah. That's one question that will push my math abilities. Well, beyond their limit, but. You've said a couple of times that 500,000 then is 800,000. Now, because of inflation. Bureau of labor statistics has an inflation calculator. And it says 500,000, then it's 650,000. You have, I'm not saying it's right. No, we've, we've done the calculation to your honor, to be honest. I mean, yes. Kind of like rounding up. Oh, no, sorry. Did you do 500,000 from when? 2016, which I thought as well. That's for our people, but the 500,000 has been the announced since I think 1990s. So we, so sure. We're not going to be, I would, we had done 800,001 under the inflation calculator that you just did. I would have been happy to. Say that, but we didn't quite get there, but our present value of money is higher than 500,000. And it's been at risk that whole time. So you're the money you invested is present value is more than 500,000. Obviously. Yes. Oh, you get the, you get the 800,000. Not by taking how much you invested, but by how much you would have been required to invest if you had invested the day. The statute was an act. I think it's a, it's a rough inflation investment and that I can provide that court, the rulemaking that DHS did were explained this more. And then it got overturned, but yeah, the point is that from the 1990s and I hope that's correct. It's been 500,000 or that amount it needed to be adjusted for inflation. They've tried various ways in the $800,000. Is that not a reward for people now? And so the point is our clients are in the middle of that. We didn't, we don't have present value of 800,000 from that state, but we have more. But the 500, what you're saying is the 500,000 figure was introduced at the outset program in the nineties. And it was just Congress lagging that they kept it low. So that's a bargain that your clients got, you know, some 10 plus years later is on Congress for not having consistently over time done the adjustment. But the conceptually that's how you understand. Right. It's more, it's a rebuttal to the notion. I think that this is somehow like the Congress meant to increase the price of admission for the special visa. I think what they did was they actually adjusted the inflation for these visas generally, and they separately provided for infrastructure projects to now get reserved visas from the pool. Please support Aaron Goldsmith on behalf of the government. If you just report properly, dismiss the complaint for lack of final agency action, because the agency's guidance issue does not mark the consummation of the decision process. It's authoritative. I mean, your view is that it's, it is the binding it's final in the sense that it's what the statute says. So problem one is not an issue in your view. It is that the issue. And if I could just respond to judge pants question, because I think it goes to the heart of this, this entire litigation that there is no reason the appellant in this case, DVRC, the regional center cannot file form I nine five, six F today. We're not saying that they are barred from doing so simply because they were designated under prior law. They can file it today. Let me explain how they would do that on page six of the form. There's a box says infrastructure project. They would check that box. Then there are two questions about the project. They would answer those questions and then they would attach the business plan. And so the, it would follow the instructions and attach the business plan and the other documents requested in the instructions. So, so they could do that today. Once they're, once they do so, once they file, they're given a receipt number, and then the individual investors could use that receipt number to file an I five 26 E. And again, they would check the box saying they're seeking an infrastructure visa and they would comply with those instructions. And then, you know, they can rely on the previously approved project in a new application. Well, they can't rule. They can. I'm sorry. Let me try this again. The fact that they were previously filed the petitions, they had an approved project that doesn't bar them from now filing the correct paperwork. And the next correct paperwork is in a form. I nine five, six F they could file that today. Now, and they can rely on the same business project, business plan. They can submit the same business plan. Correct. And your position is that that would be denied. No, the, the, the application, the project application might be approved. The real problem, the real flying in the words of the district court judge would be with respect to the petition because they haven't invested the, they're not eligible for a, for an infrastructure visa because they haven't invested 800,000, but we're not even at that point yet, but you wouldn't accept the inflation adjusted 500. That was, I guess, invested years ago, which would have been the equivalent of 800. No, we, we, we just, we, again, government design felt like we make a decision. We deny it. We would write a written decision explaining, find the law of the facts, explaining it. And if they could challenge that at the EPA, it would have the option of taking the necessary field, but our position, what was the fly on the ointment? The fact that they have failed to invest the 800,000 required by statute. So that if they filed the petition, that's another 300,000. Well, in theory they could, but as you just heard a few minutes ago, the project is completed. So I don't know how they would be able to invest the additional 300,000. They can't invest 300 in different projects. It has to be 800 all in one project. I believe that's a different qualifying infrastructure project. If there were one, I don't, I think it would have to, we're a little bit ahead of ourselves because none of these applications or petitions have been filed, but I think that's correct. They, I think they would have to invest it in the same project, but again, you know, if they did something different, they applied and we denied the petition. As you indicated, there would be an administrative record. There would be a written decision explaining our position. They could take an administrative appeal. They could challenge that petition, that denial in district court under the APA, but we're not even. That would be another way to address it, but here they are reading the statute. I think, or reading the rule, the way you read the policy or answer the way you read it. And they're saying, this is saying that the determination is only made post act with the application. And they believe that it's open to a different interpretation, which is that it, an already approved infrastructure project could be treated without a new application as an investment vehicle that qualifies the investors for the set aside visas. That's their reading to the extent that there's a difference between those two. How is there not reviewable final agency action at the, at the policy level? Well, again, just to be clear, our, our objection is what to use your judge pants words, that this idea that we have to sue us, bond take, go back to review previous petitions and violence. And I think that's what you're getting at. Well, no, I'm just asking you a much simpler question. How is this not final final in the sense that there's a dispute about what the statute requires and you may win it, but there's a dispute about the meaning of the statute. And your view is that, yeah, it's binding. It's the statute and sure. It has consequences, but it's the statute, but they're saying, no, it's not the statute. We have an interpretation that says your policy, there's actually a little daylight between your policy or your answer and the statute. That is the issue that they say is the subject of final agency action that they want to have decide. And what I don't understand is how the finality of that evaporates under your view. Well, it doesn't represent the consummation of the agency decision-making process because simply identifying you're saying, because there was no agency decision-making process, Congress did the decision-making, but they're saying, no, at least recognize that we have articulated a different position and that the agency didn't choose it. That is a decision-making process. Is it not? No, I don't think so. At least within the meaning of the APA. And I think you're going to disagree with me on this, but the view is simply referencing the correct form to file by itself is not a final agency action. It doesn't represent the confirmation of decision-making process. It doesn't, it doesn't, there's no legal consequences that flow from, from simply identifying the correct form. Agencies run off forms that the fact that you have form, someone has to use to self-identify to provide a business plan to us so that we can review that by itself is not final agency action. And there's no case that says simply identifying the correct form. It constitutes final agency action. And this case was not filed under 706-1 to compel agency action unlawfully without. That is, if the point was we had an obligation with the statute to review, to respond to review previous filings, that would be a different matter. And just to be clear, these files, each petition had many cases over a thousand pages of documents, financial documents, including the business plan. And each petition had the same, had also had a thousand pages because you under prior law, you could not incorporate by reference. So if you went to the investor, immigrant investor program office, you would see it's all on paper format. There are these multiple filings. But that burden is beside the point to the extent that we have one case before us. And they just come to you and identify this project and could be completely reasonable for the agency to say, we're not going to go dig through files unless we know somebody cares about it and they have to come to us. That could be, but that's not this case. This case is a case in which we have before us a program and you're, what you're, this seems different from the argument in your brief, but what you're saying now is, Oh no, we don't mean to imply that only infrastructure projects that were so designated after the act are eligible. Pre-act infrastructure projects are also eligible. They just have to kind of re get, get a, get a post-act seal of approval as such and everything will be fine. Is that your current position? Well, what we said on page 27 of our answering brief is that there is no final agency action because they haven't filed the project application and the individuals haven't filed a petition and that there's been no application of law to the facts. And then we say at the bottom of the page, look, just because an investor can file a petition doesn't mean the petition is going to be approved, but then there will be at least a final agency action. So the issue is here. They did not self identify. They did not file the correct paperwork. Your view is not just that the, that the infrastructure project would have to refile, but that the investors would too. Correct. And the investors lose their priority date. No, no, no. You can ride two horses at the same time. That is if you have an approved petition for a regular E-5 petition, I see my time has expired, but if I could just continue. Absolutely. You know, you know, our practice. So you could, you can continue. You're you're locked in with that petition. And then you can also file a new petition. And I form a form I-526E, you check the box saying you'd like an infrastructure visa. And then that is separately adjudicated. And then what would happen is under 1154B is, is that the approved petitions are sent over to the state department. So the approved petition for a regular EB-5 petition was already sent over to the state department. If they get an approval of a new petition, that would also be sent over to the state department and the state department would receive a stamp approved. It would have the priority date and they would use that to schedule an interview for a consular officer. And then they would, they would at that point formally apply for the visa and either be granted or granted. So you can ride two horses at the same time, but you have to buy another horse. You can't ride the horse you're already on and go through whichever gate opens first. I would say you would have to file the correct paperwork. Well, but you also have to spend another $800,000. Well, again, here's the problem because their investment was less than 800,000. They have a problem. If their initial investment hypothetically were 800,000, they would not need to make an additional investment. They would say, we have an approved one. Now there's this newly created program that didn't exist before for infrastructure visas. The agency's never previously been making determinations. Is this an infrastructure project within the meaning of the statute? Because there was no statutory definition of what an infrastructure project is. And then they would, they would, they would, they would say, okay. We find a project application. That's what the regional center would file. It would take a receipt number. They'd file the individual petition and they'd say, look, we've invested the 800,000 and the agency would make a decision. And for all we know, it might be denied for some reason unrelated to 800,000. There could be some other defects, but we would at least have a final agency action at that point. What does that mean for these plaintiffs? What should they do? What can, what are their options? Well, I think when the district court said, this is the fly on the ointment. This is, this is what I think district court was referring to, which is if they file a petition and they admit they don't meet the, the minimum dollar amount, then the agent is going to deny the petition. And then they would sue under the APA saying that the government is not correctly interpreting the law, or they would take an administrative appeal to the administrative appeals And, and they would doubt that's how you would get a decision, but it would be a decision based on administrative. Oh, but that's how they would get a negative decision. Maybe this is not appropriate, but I think, you know, if they could get a positive decision, what do they need to do? Number one, they probably need to find a new $800,000, right? Well, they would either have to. Or can they find 300,000? They'd either have to invest the 300,000 in the project, which you just heard they can't do. What if they invest the 300,000 in a different project? They qualify, an infrastructure project, which I gather there aren't any, but there may be. So I don't think the agencies ever put out guidance on that specific point. I think the answer is no, but we're ahead of ourselves because they haven't even applied. If they had said, yes, we're doing this. And the agency says, well, that doesn't count. Then we would litigate that issue. Mr. Goldsmith, it's a little rough on people who are putting their life savings, tying them up for decades to say, well, we'll tell you when we get there, whether you have any chance of getting the carrot that we've been holding out. So there is an inbox on the website where you can send inquiries about questions about how this program works. And they've, over the past year, had received several thousand inquiries on it. Are they losing anything? Because I guess they qualified to just get into the unreserved visa pool, which is what they bargained for when they made their initial investment. So I'm wondering, are they losing anything here when you set aside the 2% to reduce their chances in the unreserved visa pool? Because I guess I think it's important that they're still in the same position that they bargained for and that they want. They are in the unreserved visa pool and they can get a visa that way. It's just difficult. And now there's a new, better way to do it, which would be a benefit, something in addition to what they previously had bargained for. And there's a question as to whether or not they can apply to get this new additional benefit, but are they in a worse position by the fact that now there is a new additional benefit? Does that worsen their chances in the pool that they're in? I'm not sure it does, except to the extent that I guess you could say, you know, if anyone gets an infrastructure project before that, it's hard for me to answer. I mean, anybody gets an infrastructure project or a rural areas project or an unemployment areas project. And let's say those are also Chinese nationals. If there's a lot of Chinese nationals in those pools, then boom, the 7% gets used up and the priority date become, stagnates where it is for the person who's in the original. Yeah. Except that Congress made the decision to create the reserve visas. I understand. We didn't, we didn't create that program. People will probably get it. Go ahead. Well, I think this is, I think we're on the same track. Okay. The ones Congress created, did it, did it rob the general pool in order to create those? Or did it keep the general pool number the same and then just add these additional. No, it's 2% of the 7.1% number. 2%. Yeah. So it is. So it does make it. I mean, they are in the worst place after the, assuming they are assuming that they can't take advantage of the reform act. They are in at least a slightly worse position after the reform act than they were before the reform act, because they're grasping at the limited number of visas that have now become slightly more limited. I think that's correct. And I would, can you have two places in line? You said you could ride two horses. Can you stay in the unreserved? Yes. And then meet the requirements for the reserve pool and be for that. Whatever gets you there first. Yes. You can, you can, you can do both. Yes. You can have two projects. The one that they did and they could just do a whole new project. That's right. Assuming they meet all the other requirements. Yes. That's correct. Problem. And I, and I think you said, as you don't have guidance on it yet, is it your position? Let's say the SEPTA project got filed, you know, post closure of that project to be treated as the infrastructure project under the act. Right. And then an individual said, you know, at the time it was an infrastructure project. It is now an infrastructure project parentheses. I completed one and I invested in that infrastructure project. And my claim for visa is still alive because I'm my priority date is what it is. And post act prospectively, I meet all the requirements for one of the 2% set aside visas. Is your position that that person based on the $500,000 that was adequate at the time necessarily loses or that we don't know yet. I would have to, you know, I think our position is in order to get an infrastructure project visa, you must have invested 800,000. And that's because that's what Congress said in black and white. And we can't create a Frankenstein program, taking some aspects from the new law and some aspects from the old law to create a new program that Congress never had. It passed through the qualification under five, five 26. And the only question is, do they qualify for the set of sides? And that really depends on whether their investment was a qualifying investment for an infrastructure project. Because the project files a nine, whatever nine and something E I nine, then, then it wouldn't be an inadequate investment because at the time it was fully adequate. So we read the statute differently, but we're ahead of ourselves because they haven't filed the petition. And the reason we read the statute, the way that we do is because when Congress says in order to get infrastructure, it has to be 800,000. We think that means the investment has to be 800,000, that there's no exception. And, and you can't take, have some aspects of old law apply in some aspects of, of, of new law. I would add that there are regional centers that were designated under the old law who have now filed the correct paperwork, the I nine five six F to be designated as projects for areas of high unemployment. And then subsequently individual investors have filed the I five two six E petitions in connection with it. So it sounds to me like your position at oral argument is a reasonable one. But when I look at this case, the, um, Collins came in and said, Oh my God, you said you're going to adjudicate whether we qualify for these reserve visas at the time of, um, adjudication, I guess, at the time that we apply and that means, and then they had a whole parade of horribles. That means we can never apply because we've already been approved. And this implies that you can't approve this again and all these things. And you didn't just say, no, that's not what it means. All we're saying is reapply. You have a whole brief that doesn't lay all this out. I'm just wondering why you didn't just, so the position that you're taking now at oral argument in your briefing, which would have perhaps given clarity to the appellants and avoided this brief, we said, they haven't filed the I-956. They haven't filed the I-526E. And we said at the bottom page 27. There's all this argument in the brief about what does approved mean. That's correct. And you, instead of just saying, just apply again and maybe you can be approved, you joined the issue and said, no, no, you can't be approved. I don't understand why you would do that when you're taking a different position now at oral argument. So what we're saying is that we wanted to respond to each and every argument that's raised in the opening brief. As do, as do. And the key point is whether or not we have to sui sponte, go back and look at those whole filings. And we argued, we had all these arguments, statutory arguments, arguments about all the different provisions as to why we don't have to go back. It's just not all clearly laid out in your brief. Like I understand that that is actually what's driving your position. Yes. And I don't think that that's necessarily unreasonable, but this is just the way this whole thing is briefed. These sets of briefs talk about a hypothetical situation that now you're telling me is not the situation. No, it's not the situation. And that you can file, they can file the I-956 application. And, and, and I think the district court hit the nail on the head when he said that the guidance is not the agency's last word. It just tells them how to begin the process of applying that the, the guidance has no, in the district court's view, has no legal effect. And for those reasons, the decision of the district court should be affirmed. You refer to page 26 of your brief? I think it's at 27, but let me look at it. Yes, Your Honor. We said that second paragraph here, the regional center never filed the application and the individual investors never filed the I-526 petitions. And as a result, there was no agency adjudication petition or other request. I can get that on page 27. Bottom, page 27. You say DVRC never filed a form I-956. Oh, I see, I see. Appellant investors never filed a form I-526E to be sure they wouldn't be eligible in the footnote. But there was no agency adjudication. It seems like a futile action given the position of the agency. I mean, what they're challenging is an interpretation of the statute, filed or adjudicated, filed or approved. Thank you. And they're saying you're reading the approved out of the statute because they were approved pre-act, so they shouldn't need to file. I mean, that's their theory. And so you're not responding to their theory that approved. And you're denying that you're even taking a position. But of course you're taking a position. You're taking a position that both filed and approved are things that happen after the act. Am I right about that? Filed and approved are both, in your view of the statute, post-act. Yes. Okay. They're taking a different position. Why is your policy on that A, not final, and B, not one that has consequences? Because it doesn't represent the culmination of the agency's decision. The agency's decision on policy, will we treat a pre-act approval of a project under, what was it, the TEA, as an approved infrastructure project? That issue, you have taken a final position on, have you not? Again, I recognize that you disagree. No, I don't think that's true. You haven't. You might actually start treating pre-act approval of infrastructure projects or high unemployment area projects or rural areas as approved for purposes of the statute. No, no. We're just saying they have to follow the right paperwork. Right. And that is an interpretation of the law that differs from theirs, and that is final from USCIA, I assume. I don't think it's a final agency action. I know you disagree. I'll just say that there's no authority that we have been able to find. It's simply identifying what the correct form to file constitutes final agency action. No, no. Articulating a disputed statutory interpretation is commonly something, whether it's in a guidance or in any kind of binding document, that the agency says, this is going to be our thing. I mean, look at poet refining. This is our thing. This is how we're going to do it. Fine. But there was a little bit of a difference there, because the guidance really limited the agency's discretion. Is it your view that the agency here, USCIA, retains discretion to treat some projects approved before the act as qualifying without filing anything first? No. It doesn't. But just to be clear, there was never any adjudication under the old law as to whether or not something constituted an infrastructure project with a meaningful statute, because the statute didn't define what an infrastructure project was. And there was no, not only was there no definition, there was no infrastructure reserve set aside under the old law. So the agency necessarily could not have made a determination on that. And what the agency was deciding was they were approving petitions, applications. They were explaining when they would defer to prior, under the deference policy, they would defer to certain determinations that were set forward and exhibit one to the complaint. And I understand we're in dispute as to whether or not this is final agency action. Is the agency action the actual words on the website and in the manual? Because the only words are, we're going to determine this when adjudicating the project application. And if that's the action, that seems consistent just with what the statute requires. And it seems to me that all these other arguments, well, that means we can never be approved. What is approving? What about people before? That's not reflected in the actual agency action, which is the words on the page. The words on the page simply say, we'll make a decision on the application when we make a decision on the application. You've taken a position just in this litigation about what that would all mean. Well, we certainly do with that. So we've certainly taken a position as to the 800,000 issue. The answer I think is you don't need to address those issues. You don't need to decide more than necessary. The key issue here is that they simply haven't filed any of the paperwork. They haven't filed the application. Your position is they can. They can. Yes, correct. But that would be filed. That would not be approved. I mean, the way they're reading approved, it might refer to a pre-act approval. And you reject that. Well, wait, but wouldn't it be adjudicated when they apply? Their reading approved is already approved. And your reading approved is approved after the act. Well, let me just say to a certain extent, necessarily you can't have something that's approved until after it's been filed. Like in a sequence of time, something is always filed before it is approved. It wouldn't make sense to say we stamp something approved before it was filed. But they can rely on the previously approved project you said. I thought you previously said that in this argument. They're not barred from applying. They can apply. And could they possibly be approved based on the project that previously was the underlying project for the pre RIA? Yes. They don't need to receive designation. We've already been designated. They just need to file the I-956F to say that the project is a infrastructure project and they need to submit the business plan so that the agency can review it and make a determination. So it can be approved, even if it was previously approved. Correct. But there is a slightly, you say they don't need to be re-approved, but they kind of do because they're approved as a project, but now they need to be approved as an infrastructure project. Kind of an extra check mark. Well, they were originally designated as a regional center. And whether that was the subject of the Bering litigation, that's really not before the court. There's no question that DVRC is a regional center. We're not disputing that. What we're saying is they have to file the correct paperwork to get a determination as to whether or not they're an infrastructure project. Right. That was what I was saying. Okay. You're agreeing with that. Can I see if I'm following? I think it's part of your argument. They have a reading of the statute about whether the word approved is in the statute. You disagree with that reading of the statute. You have stated that disagreement on your website. Let's say I think you're correct. You have a better reading of it. We could assume, just for the sake of argument, that that is the culmination of agency decision-making. But there still might not be final agency action because it may be that what you've done has not had any legal consequences. Correct. That's possible. And the reason, and I'm not endorsing this, but the argument would go, the reason it doesn't have any legal consequences is because the statute required this the day before your answer was posted on the website, the day it was posted, the day after it was posted. Their legal rights have not changed simply because you have stated on your website the accurate meaning of the statute. That's your argument, right? I think so, and I think that's what this report said on page 101 of the joint appendix. Does that have any limit? My guess is that there are cases that an agency puts a statement on their website that is an accurate statement of what the statute requires, and a panel will sometimes say, well, that does have legal consequences. That is final agency action. Are there cases out there like that? Yes. The decision that was just referenced, P-O-E-T, said that basically the agency took the position this is a final agency action. What do you see as the limiting principle on the argument that I laid out, that if you're just summarizing what the statute is, you're not actually creating any legal consequences? What's the limit to that? It's a difficult question to answer in the abstract because the inquiry into finality is a practical inquiry, right? So it's more like you know when you see it, whether or not it has practical implications beyond what the statute says. So there might be some situation. It's hard for me to say what is the outer limit. I can imagine. Let's say that the statute says the agency is allowed to do X, Y, and Z. And the agency says on its website, we're going to do Y. I see how that's like the legal regime a little bit. Because you might have thought they were going to do X, but instead they said we're just going to do Y. But if the statute says the agency is required to do X, Y, and Z, and then they say on their statute, we're going to do X, Y, and Z, that seems like legal consequences. There are no legal consequences. There are no legal consequences of that hypothetical. That's not a final agency action. Right. So I mean, is that the law? Is that basically the law? You said it's kind of, you know, it may sound like it's something like, you know, prep. Yeah. I mean, every day is a new day. And it's like, I know when I see it, but. Yeah. I mean, if it's just repeating what the statute already says, then there are no practical consequences. There are no final agency actions. I see my time has expired. Respectfully would ask that the court. Affirm the decision. Does your position on. The answer that you just gave to judge Walker. Does it entail that the. Appellant's reading of the statute is in effect frivolous. They don't have. A plausible alternative reading of the statute and therefore. There are no consequences because they never had. An alternative reading that needs to be decided. That the rejection of which affects their client. Well, the statute is unambiguous on something. And yes, there's, there's no alternative other than to apply. Even if people disagree. About the meaning of the statute, because you can have a disagreement as to an unambiguous provision. You responded to the filed or approved saying, well, there does seem to be some. There you can take the position that. What that means is that the secretary can either. Treat something as a infrastructure credit based on the filing before it's been fully approved or after it's been approved. Both of those are occurring after the act. You didn't take that. No, no, we didn't. We said it's unambiguous. Well, that, that would be unambiguous reading too. You just have a reading that says, yeah, there's some unexplained belt and suspenders here. And I'm just curious why. Why do we think it sounds unambiguous? Well, we think. Why is our two words used when your view is that. Only one really is operative. So, so we don't know subjectively why Congress used it, but we haven't. I mean, our two is the same. What the district court suggested as possible. Previously under prior regulations. You needed to have an approved application. Designating a regional center. It's a regional center. Before you could file. An I five to six petition. Under the current. Statute. And that's in subparagraph F. It says that now it just needs to be filed. And once it's filed, you get a receipt number. And then the individual investors can file petitions. So that. Of filed or approved. It's just kind of a reference to this change. In the statute now. That might not be correct. I mean, that obviously we don't know that for a fact. That's what the Congress had in mind. But that's a reasonable. It's kind of a. Withered away appendage. Of an earlier time. No, I think it emphasizes the change that the staff, that the reform and integrity act made to the prior practice of the agency. Under the agency's age. Regulations prior to the enactment of the statute. It had to be have an approved application. For designation of a regional center. Now, you just need to have. Before you could file a petition. Now, you can, you just need. To have a filed. Application for designation. Now, again. In this case, the regional centers already been designated. So that's not really the issue. But that's one reasonable. Possibility as to why Congress use those. Those words, but that seems to be further support for the appellant. Sorry to be beating a dead horse here. That. Their theory is that. Okay. Then approved in that context. Refers to the prior practice. Because now it only needs to be filed. So post act. File and get a number. And the fact that they're referring also to approved project. Means those ones back when you had to have an approved project. Just because it's filed or approved. This plan. It doesn't use the term practice. I know. I've done the same thing. I just want to make sure we're talking about. That's helpful. Thank you. Yeah. So, so that is their theory of the case. We don't think that makes sense for the reasons we set out in our. Right. Thank you. Thank you, your honors. I have just a couple of points I'd like to make. One is just whether something was a policy was actually made by the. Website posting in the policy manual. I think it's an important question. You raised it. I would direct the court's attention to a 64. So that's the joint appendix at 64, which includes. That's the. Where it says, this language you've already been describing in the policy manual. Determines whether a project meets the definition of infrastructure project. During adjudication of the form. I 9, 5, 6. Okay, that's the policy. And then they have a footnote there. And that goes back to the provision of the statute. What they're citing is a part of the statute. The statute says that the secretary of Homeland security shall determine. Whether a specific capital investment project. Meets the definition of infrastructure project. Set forth in sub paragraph D. What the statute says. Is that the secretary of Homeland security shall make a determination as to whether a project is an infrastructure project. What the policy says is that they will make it at the time of an adjudication of a form. That's a new form. That was not a form available before the. And so I think it's, I appreciate your questions earlier. What is the policy? The policy is. That will not make an infrastructure project determination with respect to already approved plans. That is the policy. The policy has manifested itself. If we call them up and they told us that. That would be the policy. The way they've expressed that policy. I think opposing counsel just said that if you reapplied, they would consider that previously. I find that to be frankly offensive as a suggestion, both because that was, this is litigation has been going on for well over a year now. I look back at the motion to dismiss at the district court level. We were told that this was an interpretive rule, not a legislative rule. And it wasn't final agency action. And that website posts. This can't be final agency action. No one ever told us to file any form. Now in the opposing refund appeal. They do have that reference that you all heard about during my, my opponent's presentation. And they have a footnote saying to be sure you have to actually meet the requirements. We have every reason to believe we were not here for fun. We're here because we have a real stake in this because we know if we file that. It's going to be denied. Your view is that we have to have a project. That means the post RIA definition. To be approved. And we don't need that. We were a pre RIA approved project. Project. We are an infrastructure project. Our investors invested 500, not 800. Their position. Does that mean that their policy is wrong or just that you don't qualify because your particular project. Ended. I think that. I think it's two things. They've made a policy determination with respect to not approving, not issuing infrastructure project determinations for already approved projects. That's the policy and we would fail. Money is a separate thing that you would fail under anyway. We'd feel both. It could just be that you're not eligible for this reserved visa. We are eligible to meet the qualification in the statute. We do. Again, we talked about the grandfathering vision. So you have to understand our position with respect. In 1154, our people are waiting in the waiting room. Congress. It's like, I think an analogy might be a terrorist act. Congress says, give $1200 subsidy to every person. They just, he says, we'll do that for people at the time that they apply for it. And some people would already apply at the time they submitted their taxes. Some people already submitted their taxes that year. Therefore, they didn't get to get the subsidy. The government can decide to give new benefits to already existing people. That's not a problem. That's not a retroactivity problem here. I agree with that. It's just, it seems that there are additional qualifications that perhaps your clients just don't need. I think the qualification is that they have approved the addition, that they've invested in infrastructure project, the determination that they will not make. If they make that determination, If they just had a form saying for your prior approved for pre-RIA approvals, please submit 956Z. And we can show them that we had an infrastructure project. The USCIS said in approving our project that it was an infrastructure project. And we could take that tomorrow and all the people with the 526 is approved to get their visas. The problem is that's not. But I hope I convinced you that that really is an inflation adjustment. That is not. And I really ask you to read that part of the statute. I guess so. I just feel like all of this. We're kind of getting ahead of ourselves because there's no agency record on any of this, like what they would actually do. I think this is what the, I appreciate your points. I don't want to argue. It's more, this is what the APA was made for. When an agency makes a consequential determination of policy that affects the regulated community, the clear way. We could file forms all day. That would be denied income in that way, or we can challenge a policy. And I think that that from the beginning of this case, we've made clear why we think this is a final agency action. We've had nothing but shifting arguments on the other side as to what it is. This is teed up to the court in a way that's understandable. And we are the ones that have an explanation of what approved means. They don't. That whole response that they were giving to you, Judge Pollard, about this being about some change in process. There was no change in process. People could always apply for their 526s pending the business plan being filed or approved. So this is just obfuscation on the other side as to what approved means. We have a meaning. They don't. And in that case, we should win the statutory interpretation argument. And it's a real moment. And that's why we're here. But you don't dispute that there is some supplemental determination. USCIS would have to make to confirm that the SEPTA project was an infrastructure project, which is a new category under the RIA. Correct. And I think an agency faithfully interpreting the statute, giving meaning to all the words, would have put a form up on his website, 956, whatever. And we'd say for people that want to have their prior projects approved, there's no form that is for that. And I took this to go with it to be saying, well, there's a checkbox on 956 F where you can say, that's for new projects. But you could say, you know, fill in all the things that ask for information, see prior, see, prior, see, check that box. Boom. I guess anyone can show out any form and send it in. It's a brown peg in a square hole and they've not, there's no, they have voluminous instructions, none of which suggest that that's appropriate. And look at it made clear both on the website posting, which I agree is a little oblique, but their position in this case is that prior approvals don't count. And I guess they changed that here at argument, but. You know, I, we have no reason to believe that that would be granted, but any, if any, that we're here now with a final agency action, we're here now with a argument that's contrary to law and all we want would be someone to make the infrastructure policy determined. Project determination so that our people can have access to the reserve visas that will again expire soon. Well, in the meantime, if you've given you something to, to talk to them about, to try to hasten approval of your. Well, I mean, I didn't. On that note, by the way, it's not. Not that we brought this because we were trying to avoid a process. There was not a process. There's not a form. And that's why we brought this action. They never disputed that for the entire time we were in district court. Just to be clear, but also we're here now because, you know, this is a consequence to people in their, in their lives. We got a. State law diversity case. And it said. $80,000 is in dispute. That's more than the $75,000 threshold. That was decided in 1996. I think we should dismiss for lack of jurisdiction because $80,000 today is worth less than $75,000 in 1996. I'm not sure what the, if there's a law on whether, like, can you. Kind of. Grow into diversity jurisdiction. Is that what you're suggesting? I'm saying, you know. Acne companies. Oh, they meet the requirements at the time and then the issue in 2024. Yeah. And they say there's $80,000 in dispute. We cleared the $75,000 threshold. This court has diversity jurisdiction. Can we come back and say, no, we actually lack diversity jurisdiction. Because it's true. You have $80,000. And it's true. Congress said. There's a minimum $75,000, but it said that in 1996. And $80,000 today. Is worth much less than $75,000 was worth. In 1996. I think you have to apply the statutory threshold to Congress set. But I think here, that's exactly what our point is, is that we met this. The statutory threshold at the time that petitions were granted. We've. You want to get. A benefit that Congress has said, we'll go to people who have. Put out $800,000 and you haven't put up $800,000. And you say, well. We should get credit for having done $800,000 because we did $500,000. When only 500 was required and 500. At the time Congress decided to require it is now. I understand your point. It seems like you may not be sympathetic to our argument on this. But I just would respectfully say it would be different if we were in here saying that the amount is now tomorrow. The Congress clearly said to get a reserve visa going forward. You must invest $800,000 going forward. But isn't your point? We filed with $80,000. When the amount in controversy was. $75,000. I think so. And our case is still pending when Congress raises it to $150,000. If our case is still pending. We don't have to file another. We don't have to submit another. $70,000 to me today's amount controversy because when we filed, we met it. Done my math was worse than yours and that was a better answer than mine. But yes, that is my point. I think the point is that we're not trying to read into, like, we're not saying we're here now. And we invested 600, but you should count it as 800 because it's inflation. My only point was that we have to understand what was the 800 doing? And I think the district court, through no bad faith, just misunderstood that as a condition to the new visa. As opposed to just simply the inflation adjustment in this provision. Meanwhile, reserve visas are allocated in this version. And then over here, it says, make the determination. And judge, which is really just said, maybe perfect way to read a statute. I think that's different than saying we should care about whether there's been inflation between 1991. Just to be clear, I'm not making a generalized inflation argument. My only is to understand what the $800,000 is and whether we're trying to cheat the system here by not paying $300,000 more. And respectfully, my point is that that was not supposed to be a higher threshold now to get the new visa. I said that was a correction for inflation generally for the priority visas. We actually probably benefited from the fact that $500,000 in 1991 or whatever year it was originally set was actually worth a lot less than. We know it was worth $650,000 for the people in our case. A lot more than it was when you invested $500,000 in 2012. I think the point of the inflation point was just to really kind of debunk the notion that somehow it would be a different statute altogether. If the Congress had said, we believe that you have to buy in with a higher amount to get these special visas. And therefore, we're doing that. That is not the statute Congress wrote. The statute Congress wrote said we were adjusting the amount of buying in for both special and non-special visas. Generally, we also are making reserve visas available. And you should make infrastructure project determinations for filed and approved. So we're not. Nobody's arguing. I mean, your clients are in the non-special visa queue. And they have a priority date in that. And under the RIA, the investment amount for that has gone up to over $1 million. And nobody's arguing that they're disqualified because they haven't paid a supplement. That's a great point. Yes. So to be fair, we're not really in it. Again, this is maybe our fault, too, in the brief. We're using the line. I know it's what analogy to use. We are in a waiting room. So it's not like we're trying to, like, jump the queue and go to the other queue. We don't have any. We're waiting for a visa bulletin that has our date. At that point, we can then apply and be in a line. So right now, we are in a massive waiting room. We're in a line in the sense of a priority date. Correct. But we're not. Right. But we're not. We haven't made that application yet. We make the application. So we wait for whatever visa is available to us. We will apply for that. And so we're not, like, in one line. Thank you. Thank you. Thank you all for bearing with us as we had so many questions today. Case is submitted.
judges: Pillard, Walker, Pan